UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ERIK T ANDERSON,

          Plaintiff,

v.                         Case No. 19-CV-1709

ANDREW M. SAUL,
Commissioner of the Social Security Administration,

          Defendant.

## DECISION AND ORDER

### 1. Introduction

Alleging that he has been disabled since February 1, 2013 (Tr. 21), plaintiff Erik T. Anderson seeks disability insurance benefits and supplemental security income. After his application was denied initially (Tr. 140-52) and upon reconsideration (Tr. 168-87), a hearing was held before an administrative law judge (ALJ) on October 16, 2018 (Tr. 41). On January 17, 2019, the ALJ issued a written decision concluding that Anderson was not disabled. (Tr. 33.) After the Appeals Council denied Anderson's request for review on September 23, 2019 (Tr. 1-4), he filed this action. All parties have consented to the full jurisdiction of a magistrate judge (ECF Nos. 4, 6), and this matter is ready for resolution.

## 2. ALJ's Decision

In determining whether a person is disabled an ALJ applies a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At step one the ALJ determines whether the claimant has engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). The ALJ found that Anderson "has not engaged in substantial gainful activity since February 1, 2013, the alleged onset date[.]" (Tr. 24.)

The analysis then proceeds to the second step, which is a consideration of whether the claimant has a medically determinable impairment or combination of impairments that is "severe." 20 C.F.R. §§ 404.1520(a)(4)(ii), (c), 416.920(a)(4)(ii), (c). An impairment is severe if it significantly limits a claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1522(a), 416.922(a). The ALJ concluded that Anderson has the following severe impairments: "benign brain tumors status post resection 2008; disorders of the back; personality and impulse control disorders[.]" (Tr. 24.)

At step three the ALJ is to determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (called "the listings"), 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1525, 416.920(a)(4)(iii), 416.925. If the impairment or impairments meets or medically equals the criteria of a listing and also meets the twelve-month durational requirement, 20 C.F.R. §§ 404.1509, 416.909, the claimant is disabled. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant's impairment or impairments is not of a

severity to meet or medically equal the criteria set forth in a listing, the analysis proceeds to the next step. 20 C.F.R. §§ 404.1520(e), 416.920(e). The ALJ found that Anderson "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments[.]" (Tr. 24.)

In between steps three and four the ALJ must determine the claimant's residual functional capacity (RFC), which is the most the claimant can do despite his impairments. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a). In making the RFC finding the ALJ must consider all of the claimant's impairments, including impairments that are not severe. 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2). In other words, "[t]he RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96-8p. The ALJ concluded that Anderson has the RFC

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except never climb ladder ropes and scaffolds; occasionally climb ramps and stairs, balance, stoop, crouch, kneel, and crawl; frequently reach with the left upper extremity; frequently reach overhead with the left upper extremity; frequently handle and finger with the left upper extremity; limited to jobs that can be performed with limited field of vision when looking to the left, but with no restrictions on vision when looking straight ahead or to right; avoid concentrated exposure to excessive noise and excessive vibration; avoid all use of moving machinery and exposure to unprotected heights; no commercial driving; no contact with children; limited to understanding, remembering and carrying out no more than simple instruction; limited to employment in a low stress job, defined as having only occasional decision making required and only occasional changes in the work setting; limited to work where there is no production rate or pace work such as an assembly line; no contact with the public; and only occasional contact with co-workers and supervisors.

(Tr. 26.)

After determining the claimant's RFC the ALJ at step four must determine whether the claimant has the RFC to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1560, 416.920(a)(4)(iv), 416.960. The ALJ concluded that Anderson was "unable to perform any past relevant work[.]" (Tr. 31.)

The last step of the sequential evaluation process requires the ALJ to determine whether the claimant is able to do any other work, considering his RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1560(c), 416.920(a)(4)(v), 416.960(c). At this step the ALJ concluded that "there are jobs that exist in significant numbers in the national economy that [Anderson] can perform[.]" (Tr. 32.) In reaching that conclusion the ALJ relied on testimony from a vocational expert, who testified that a hypothetical individual of Anderson's age, education, and work experience could perform the requirements of occupations such as jewelry racker, hammermill operator, and data entry worker. (Tr. 32-33.) After finding that Anderson could perform work in the national economy, the ALJ concluded that he was not disabled. (Tr. 33.)

3. **Standard of Review**

The court's role in reviewing an ALJ's decision is limited. It must "uphold an ALJ's final decision if the correct legal standards were applied and supported with substantial evidence." *L.D.R. by Wagner v. Berryhill*, 920 F.3d 1146, 1152 (7th Cir. 2019) (citing 42 U.S.C. § 405(g)); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'" *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017) (quoting *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010)). "The court is not to 'reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner.'" *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (quoting *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). "Where substantial evidence supports the ALJ's disability determination, [the court] must affirm the [ALJ's] decision even if 'reasonable minds could differ concerning whether [the claimant] is disabled.'" *L.D.R. by Wagner*, 920 F.3d at 1152 (quoting *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)).

**4. Analysis**

**4.1. Opinion Evidence**

Anderson argues that the ALJ erred by giving "little weight" to the opinions of treating psychologist Ashley Hakes, PsyD, Licensed Psychologist; Lawrence "Randy" Withrow, PhD; Paul D. Grady, LCSW; Nathan D. Glassman, PhD, ABN, ABPP, Licensed Neuropsychologist; and Steven P. Kaplan, PhD, rehabilitation psychologist. He contends that the opinions of Drs. Hakes, Withrow and Glassman should be given controlling weight, the opinion of Mr. Grady should be given either controlling or greater weight, and the opinion of Dr. Kaplan should be given greater weight.

"For claims filed before March 2017, a treating physician's opinion on the nature and severity of a medical condition is entitled to controlling weight if it is well-supported

by medical findings and consistent with substantial evidence in the record." *Johnson v. Berryhill*, 745 F. App'x 247, 250 (7th Cir. 2018) (unpublished) (citing 20 C.F.R. § 404.1527(c)(2); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016)). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion" to determine how much weight to give the opinion. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(c)(2)). While "[a]n ALJ must offer good reasons for discounting a treating physician's opinion," *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (internal quotations and citation omitted), courts will uphold "all but the most patently erroneous reasons for discounting a treating physician's assessment." *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015) (citing *Luster v. Astrue*, 358 F. App'x 738, 740 (7th Cir. 2010) (unpublished)).

**4.1.1. Ashley Hakes**

On January 23, 2017, Dr. Ashley Hakes, Anderson's treating psychologist, met with him "[t]o gain a more accurate estimate of Mr. Anderson's neuropsychological functioning." (Tr. 896.) She stated that Anderson "reported to session and was eager to complete testing. It is the opinion of this clinician that Mr. Anderson put forth full effort on the measure and the results are an accurate reflection of his current functioning." (*Id.*) She administered the Repeatable Battery for the Assessment of Neuropsychological

Status (RBANS) "to measure cognitive and neuropsychological abilities" and gain information on Anderson's "ability to plan and carry out behavior consistent with cues and task requirements[.]" (*Id.*) Dr. Hakes stated that Anderson's overall score for general cognitive functioning was in the extremely low range, suggesting that he is prone to problems with attention, memory, and constructional abilities. (*Id.*) Dr. Hakes concluded that "Anderson should be evaluated for eligibility to receive SSDI benefits"; should minimize presented information and ask Anderson to repeat information provided to him; instructions or appointments should be written down and provided verbally so Anderson has the best opportunity to retain the information; should use regular routines and structured environments; and "may need assistance with some Activities of Daily Living (ADLs), but this should be done with the least restrictive support possible." (Tr. 897.)

> The ALJ gave little weight to Dr. Hakes's opinion because it is
>
> not supported by the objective findings in the record, which show the claimant seeking just minimal treatment for the condition and having mostly unremarkable mental status evaluations (alert and oriented times three, normal speech, normal mood, normal affect, normal memory, normal insight, normal judgment, and no indication of hallucinations, delusions, suicidal or homicidal ideations) (B3F/30, Bl 7F/3, B22F/8, 12, 15). This opinion does not mention his prison behaviors or other behaviors since tumor removal and it simply fails to account for the rest of the facts, particularly the periods from 2008 to 2013 arrest, and rest of time out before sentencing in 2014. Although the opinion concludes the claimant gave "full effort" in the testing, the undersigned notes that since there was no interview (BllF/2), it is unclear how Dr. Hakes arrived at this conclusion. Moreover, the conclusion is wholly at odds with the claimant's demonstrated ability to recount his motivations and criminal activities

given just three days before this testing (testing January 23, 2017, BllF/4; group therapy notes detain [sic] his crimes January 20, 2017, Bl2F/12). Finally, since the claimant by his own admission committed his crimes to obtain money after being denied SSI benefits on a prior occasion, the potential for malingering for secondary gain cannot be ignored.

(Tr. 30-31.)

As for his statement that Dr. Hakes's opinion is "not supported by the objective findings in the record" (an argument he repeats for all of the five experts' opinions), the ALJ cited five pages from the record. Two of the pages do show, as the ALJ states, unremarkable mental status examinations. ((Tr. 648, 1203.) ("He has a normal mood and affect. His speech is normal and behavior is normal. Judgment normal. Cognition and memory are normal." "Affect Within Normal Parameters[,] Normal Mood[,] Normal Thought Process")). But the other three pages do not. One reports that Anderson has a depressed mood, blunted affect, and passive suicidal ideation. (Tr. 1206.) Another also states that he had a blunted affect. (Tr. 1199.) And a third contains no notes at all. (Tr. 1120.)

"An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). Anderson cites 21 records that show he "struggles with suicidal ideation, hopelessness, helplessness, anxiety, anger issues, lack of trust, rigid thoughts, has difficulty leaving his home, and has a need to isolate himself from others." (ECF No. 18 at 9.) Yet the ALJ did

not discuss this evidence. He instead cited five pages, only two of which actually support his conclusion. Relying on two isolated records in the face of 21 contrary records is classic impermissible cherry-picking. *See Martin v. Saul*, 950 F.3d 369, 375 (7th Cir. 2020) (citing *Denton*, 596 F.3d at 425). The ALJ failed to give adequate reasons why he credited the two records over the 21.

Moreover, it is unclear what the ALJ intends when he states that Dr. Hakes's opinion is not supported by the objective evidence in the record. Dr. Hakes's opinion was based on objective evidence—specifically, the RBANS mental status test. (Tr. 896.)

With regard to the ALJ's statement that "the objective findings in the record… show [Anderson] seeking just minimal treatment for the condition," the ALJ does not cite evidence that other more aggressive forms of treatment were available. The Seventh Circuit Court of Appeals has held that an ALJ impermissibly plays doctor when he decides, absent any medical evidence, that the claimant's condition is not serious because of allegedly minimal treatment. *Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009).

While there may be some disagreement over whether antidepressants, group therapy, and individual therapy can be characterized as "minimal" treatment, *see Cunningham v. Colvin*, No. 14-C-420, 2014 U.S. Dist. LEXIS 164005, at *21 (E.D. Wis. Nov. 24, 2014) (citing cases), the error here is not merely semantic. (Tr. 1164.) In characterizing the treatment as minimal, the implication was that, if Anderson's impairments were as bad as the medical experts opined, he would have received treatment that was more

9

Case 2:19-cv-01709-WED   Filed 03/11/21   Page 9 of 15   Document 32

aggressive than antidepressants, group therapy, and individual therapy. However, the ALJ did not point to any medical evidence suggesting that more aggressive treatment might be appropriate for a person with Anderson's alleged symptoms, and thus impermissibly "played doctor." *See Myles v. Astrue*, 582 F.3d at 677-78.

As to the ALJ's statement that "the potential for malingering for secondary gain cannot be ignored," Anderson again argues the ALJ was playing doctor. (ECF No. 18 at 15.) He argues that none of the four treating physicians or his one reviewing expert concluded that Anderson was malingering, and the ALJ does not cite to the record to support his conclusion of potential malingering. (*Id.*)

The Commissioner responds that Dr. Warren, a state agency psychologist, concluded that "more recent measures of extraordinarily low cognitive ability [are] more likely manifestations of factitious exaggeration than neuropsychological deterioration." (ECF No. 24 at 5.) He notes that "the ALJ's conclusion was consistent with Dr. Warren's opinion[.]" (*Id.* at 11.) He points out that the ALJ's conclusion was also consistent with testing performed later in 2017, which was invalidated because of evidence showing "a strong possibility that there may be some exaggerated symptom endorsement." (*Id.* at 12.) The Commissioner argues that these were good reasons for discounting Dr. Hakes's opinion. (*Id.*)

The ALJ did not refer to Dr. Warren's statement that "more recent measures of extraordinarily low cognitive ability [are] more likely manifestations of factitious

10

Case 2:19-cv-01709-WED    Filed 03/11/21    Page 10 of 15    Document 32

exaggeration than neuropsychological deterioration[.]" When the ALJ theorized that Anderson was malingering, he based that on Anderson's criminal record and justification for his crime. (Tr. 31.) The ALJ did not embrace Dr. Warren's statements as a ground for justifying his statement that Anderson was malingering so the *Chenery* doctrine precludes the Commissioner doing so now. *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88, 63 S. Ct. 454, 87 L. Ed. 626 (1943)) (finding the Commissioner violated the *Chenery* doctrine by defending "the agency's decision on grounds that the agency itself had not embraced").

The ALJ did not provide substantial support for his decision to give little weight to Dr. Hakes's opinion. As a result, it will be necessary for the ALJ to reassess Dr. Hakes's opinion on remand.

### 4.1.2. Nathan Glassman

In a medical opinion dated November 15, 2017, Licensed Neuropsychologist Nathan Glassman, PhD, opined that Anderson "had difficulty maintaining attention to simple visual tasks due to being distractable" and "will likely need reminders to sustain focus on simple visual tasks." (Tr. 1168.) He opined that Anderson "might have difficulty understanding instructions and scheduling activities. This would result in being inconsistent in meeting his daily responsibilities. He had difficulty adjusting to changing situations." (*Id.*)

Regarding memory, Dr. Glassman opined that Anderson "will likely need more time to learn new material and will be slower in gaining new skills" and "his recall of information after a short delay was impaired, indicating forgetfulness is likely to be a problem in daily functioning." (Tr. 1169.) Regarding social interactions Dr. Glassman opined, "[d]ifficulties in social interactions are expected, as he is likely to be perceived as moody, and is likely susceptible or vulnerable to emotional displays or outbursts… In emotionally charged situations, he is likely to have difficulty managing or adapting." (*Id.*)

The ALJ gave little weight to Dr. Glassman's opinion, stating:

> Dr. Glassman's conclusions were not supported by the objective findings in the record, which show the claimant seeking just minimal treatment for the condition and having mostly unremarkable mental status evaluations…[Testing] indicated a strong possibility that there may be some "exaggerated symptom endorsement" (B20F/4), and the profile was considered invalid for that reason. Moreover, there was not a word to attempt to explain when these things started (as written appears to assume since 2008) or the fact he was able to con and manipulate people for the child porn business, as well as express himself so well in treatment.

(Tr. 30.)

As with Dr. Hakes's opinion, the ALJ erred in discounting Dr. Glassman's opinion by improperly finding it unsupported by objective evidence and playing doctor in stating that Anderson sought "just minimal treatment," for the reasons described above. *See supra* 4.1.1. Again, it is unclear what the ALJ means when he says the conclusions were not supported by objective findings, given that Dr. Glassman's opinion was based on a variety of objective tests and summaries of the same. (Tr. 1162-70.)

The ALJ also noted that testing indicated a strong possibility that Anderson was exaggerating his symptoms. However, the ALJ seemed to overlook that Dr. Glassman found indications of exaggeration only with respect to Anderson's psychological functioning. (Tr. 1165.) Dr. Glassman found the other testing, including that of Anderson's intellectual functioning, was valid. (*Id.*)

Because the ALJ did not adequately explain why he discounted the Dr. Glassman's opinions regarding Anderson's intellectual functioning, remand is required.

### 4.1.3. Stephen Kaplan, Lawrence Withrow, and Paul Grady

The ALJ analyzed the opinions of Stephen Kaplan, PhD, a medical expert, Lawrence Withrow, PhD, Anderson's treating psychologist, and Paul Grady, LCSW, Anderson's treating mental health counselor, together, assigning them all "little weight." The ALJ stated:

> As [Anderson's] treating providers, they were able to personally examine [him]. However, they are drawing medical conclusions about cause and effect for vocational purposes which appear to be somewhat outside their expertise. Their opinions seem to accept and rely upon [Anderson's] self-reports for the most part, and ignore or did not consider [his] demonstrated abilities to recall his criminal actions and motivations, his ability to reason out what criminal activities gave him the greatest chance of monetary gain with the least chance of detection, his pride in ability to fool people, or his invalid profile on testing.. [sic] It is also inconsistent to say on one hand that he has lost executive functioning but still has insight into his condition. Moreover, their opinions are not supported by the objective findings in the record, which show [Anderson] seeking just minimal treatment for his mental health condition and having mostly unremarkable mental status evaluations, such as being alert and oriented times three, normal speech, normal mood, normal affect, normal memory, normal insight, normal

judgment, and no indication of hallucinations, delusions, suicidal or homicidal ideations.

(Tr. 31.) (Internal citations omitted.)

Anderson argues that objective evidence supports the experts' opinions and that the ALJ cherry-picked the record to ignore his declining memory post-tumor. (ECF No. 31 at 5-6.)

The ALJ's discussion of these three different experts' opinions consisted of a one-sentence summary of each experts' opinion, followed by a discussion of his reasons for discounting their opinions. But the ALJ did not connect his reasons for discounting the opinions to the opinions themselves. For example, the ALJ discounted their opinions because they "are drawing medical conclusions about cause and effect for vocational purposes which appear to be somewhat outside their expertise." (Tr. 31.) But he did not identify the medical conclusions to which he refers. It is not possible for the court to discern which of the ALJ's reasons apply to which opinions. Because the ALJ did not discuss the opinions separately or in a manner in which his reasoning could be discerned, he failed to build an accurate and logical bridge between the evidence and his conclusion that all three opinions should be assigned little weight.

5. Conclusion

**IT IS THEREFORE ORDERED** that the Commissioner's decision is **reversed**, and

pursuant to 42 U.S.C. § 405(g), sentence four, this matter is **remanded** for further rulings consistent with this decision. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 11th day of March, 2021.

_____
WILLIAM E. DUFFIN
U.S. Magistrate Judge